UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PAULA RENEE CHAPMAN,                    )
                                        )
            Plaintiff,                  )
                                        )
    vs.                                 )       Case No. 4:16 CV 802 ACL
                                        )
NANCY A. BERRYHILL,[1]                  )
Acting Commissioner of Social Security, )
                                        )
            Defendant.                  )

## MEMORANDUM

Plaintiff Paula Renee Chapman brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, and Supplemental Security Income ("SSI") under Title XVI of the Act.

An Administrative Law Judge (ALJ) found that, despite Chapman's severe physical and mental impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). A summary of the entire record is contained in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

---

[1]  Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.

# I. Procedural History

Chapman filed an application for DIB on March 25, 2013, claiming that she became unable to work due to her disabling condition on May 31, 2012. (Tr. 168-79.) On September 8, 2014, Chapman filed an application for SSI, with the same alleged onset of disability date. (Tr. 211-17.) She claimed that she was unable to work due to a torn rotator cuff, edema, arthritis, migraines, neuropathy, insomnia, depression, and anxiety. (Tr. 235.) Chapman's claims were denied initially. (Tr. 74.) Following an administrative hearing, Chapman's claims were denied in a written opinion by an ALJ, dated March 4, 2015. (Tr. 10-22.) Chapman then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (Tr. 5), which was denied on April 13, 2016 (Tr. 1-3). Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In the instant action, Chapman delineates ten separate claims of error by the ALJ. Some of these claims overlap, and can be summarized as follows: (1) errors in assessing Chapman's credibility; (2) errors in weighing the medical opinion evidence; (3) errors in determining Chapman's RFC; and (4) errors at step five of the sequential evaluation.

# II. The ALJ's Determination

The ALJ found that Chapman meets the insured status requirements of the Social Security Act through December 31, 2016, and has not engaged in substantial gainful activity since May 31, 2012, the alleged onset date. (Tr. 12.)

In addition, the ALJ concluded that Chapman had the following severe impairments: mild degenerative disc disease of the thoracic spine, obstructive sleep apnea, obesity, major depressive disorder, and panic disorder. *Id.* The ALJ found that Chapman did not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 14.)

As to Chapman's RFC, the ALJ stated:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a restricted range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) in that she can lift 10 pounds occasionally and less than 10 pounds frequently. She can carry 10 pounds occasionally. She can sit for up to 6 hours in an 8-hour workday and stand or walk for 2 hours in an 8-hour workday. She can occasionally climb ramps or stairs, but never ladders, ropes, or scaffolds. She can occasionally stoop. The claimant should avoid more than occasional exposure to unprotected heights or moving mechanical parts. She is limited to understanding, remembering and carrying out simple, routine, repetitive tasks, involving simple work-related decisions with few, if any, changes.

(Tr. 15.)

The ALJ found that Chapman's allegations regarding her limitations were not entirely credible. (Tr. 16.) In determining Chapman's RFC, the ALJ indicated that he was assigning "significant weight" to the opinion of consultative examiner John Demorlis, M.D., regarding Chapman's physical limitations. (Tr. 17.) As to Chapman's mental RFC, the ALJ indicated that he was assigning "significant weight" to some of the opinions of consultative psychological examiner, Heather Derix, Psy.D. (Tr. 20.)

The ALJ further found that Chapman was unable to perform any past relevant work. (Tr. 21.) The ALJ noted that a vocational expert testified that Chapman could perform jobs existing in significant numbers in the national economy, such as final assembler, document preparer, and table worker. (Tr. 22.) The ALJ therefore concluded that Chapman has not been under a disability, as defined in the Social Security Act, from May 31, 2012, through the date of the

decision.  *Id.*

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on March 25, 2013, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income filed on September 8, 2014, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

*Id.*

## III.   Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.   42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).   Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion.   *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).   This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."   *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."   *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the plaintiff's impairments.

6.      The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted).   *See also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

**III.B.   Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than

twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.   A claimant

has a disability when the claimant is "not only unable to do his previous work but cannot,

considering his age, education and work experience engage in any other kind of substantial gainful

work which exists … in significant numbers either in the region where such individual lives or in

several regions of the country."   42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security

Act, the Commissioner follows a five-step sequential evaluation process outlined in the

regulations.   20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First,

the Commissioner will consider a claimant's work activity.   If the claimant is engaged in

substantial gainful activity, then the claimant is not disabled.   20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner

looks to see "whether the claimant has a severe impairment that significantly limits the claimant's

physical or mental ability to perform basic work activities."   *Dixon v. Barnhart*, 343 F.3d 602,

605 (8th Cir. 2003).   "An impairment is not severe if it amounts only to a slight abnormality that

would not significantly limit the claimant's physical or mental ability to do basic work activities."

*Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to

do most jobs."   20 C.F.R. § 416.921(b).   These abilities and aptitudes include (1) physical

functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or

handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and

remembering simple instructions; (4) use of judgment; (5) responding appropriately to

supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work

setting.   *Id.* § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).   "The

sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. *See* 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. *See* 20 C.F.R. §§ 404.1520a(b)(3), 416.920a(b)(3). Functional loss is rated on a scale that ranges from no

limitation to a level of severity which is incompatible with the ability to perform work-related activities. *See id.* Next, the Commissioner must determine the severity of the impairment based on those ratings. *See* 20 C.F.R. §§ 404.1520a(c), 416.920a(c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. *See* 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. *See id.* If there is a severe impairment, but the impairment does not meet or equal the listings, then the Commissioner must prepare an RFC assessment. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

## IV. Discussion

### 1. Credibility Analysis

Chapman argues that the ALJ erred in assessing the credibility of her subjective complaints. Specifically, she claims that the ALJ inappropriately evaluated her daily activities and failure to seek medical treatment in assessing her credibility. Chapman also alleges in a separate claim that she need not be "bedridden or completely helpless to be found disabled." (Doc. 14 at 39.)

As a general matter, credibility determinations "are the province of the ALJ, and as long as 'good reasons and substantial evidence' support the ALJ's evaluation of credibility," the Court will defer to the ALJ's decision. *See Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quoting *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). Furthermore, an ALJ "may decline to credit a claimant's subjective complaints 'if the evidence as a whole is inconsistent with the claimant's testimony.'" *Julin*, 826 F.3d at 1086 (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)). In evaluating Plaintiff's credibility regarding the extent of her symptoms, the

ALJ must consider all of the evidence, including objective medical evidence, and evidence relating to the factors enumerated in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of Plaintiff's pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) Plaintiff's functional restrictions. *See Julin*, 826 F.3d at 1086; *see also* 20 C.F.R. § 416.929(c). The ALJ does not need to discuss each factor separately; rather, the court will review the record as a whole to ensure relevant evidence was not disregarded by the ALJ. *See McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011); *see also Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

Here, the ALJ properly discounted Chapman's credibility based upon her own testimony, the objective medical evidence of record, Chapman's daily activities, and the lack of restrictions set out by treating and examining physicians.

As to Chapman's physical impairments, the ALJ first stated that the clinical signs and findings are inconsistent with her allegations of severe low back pain and limited mobility. (Tr. 16.) He noted that Chapman presented to the emergency room in July 2012 with complaints of back pain for ten days, but exhibited only mild pain in the scapular region and a CT scan of her thoracic spine showed mild degenerative changes at various levels. (Tr. 16, 318, 320.) The ALJ stated that, approximately one year later, Chapman reported difficulty standing more than five minutes at a time, but the examiner noted that she stood longer than this during the examination. (Tr. 16, 443.) She also denied difficulty lifting her twenty-two-pound grandson, had no difficulty walking on her heels and toes, and had full strength in her extremities. (Tr. 16, 442-43.) The ALJ next noted that Chapman's primary care provider, Jimmy D. Bell, FNP, found that her gait

was usually normal after February 2014.  (Tr. 16, 454, 458, 463, 471.)   He pointed out that

Chapman denied musculoskeletal complaints in January 2015.  (Tr. 16, 483.)

The ALJ stated that Chapman's treatment history is also inconsistent with disabling

degeneration of the thoracic spine.  (Tr. 17.)   In support, the ALJ cited the following: Chapman

has no history of injection therapy, physical therapy, chiropractic manipulation, use of a TENS

unit, or surgery; is not followed by an orthopedist; and has not presented to the emergency room

for immediate relief of her symptoms since July 2012.   The ALJ did not err in finding Chapman's

conservative treatment for her back pain was inconsistent with her complaints of disabling pain.

*See Gowell v. Apfel,* 242 F.3d 793, 796 (8th Cir. 2001) (finding that a pattern of conservative

medical treatment is a proper factor for an ALJ to consider in evaluating a claimant's credibility).

Chapman suggests that her lack of treatment was caused by her inability to pay for

treatment, and the ALJ acknowledged Chapman's statements regarding financial difficulties.   As

Defendant points out, however, Chapman did not testify that she ever sought and was denied

low-cost treatment.   *See Riggens v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (claimant's argument

that he could not afford medical care was appropriately discounted given lack of any evidence that

he was denied low-cost or free medical care).

The ALJ also considered Chapman's obstructive sleep apnea, which Chapman claims

causes extreme fatigue.  (Tr. 17.)   He stated that a sleep study Chapman underwent in May 2014

revealed a "suspected pathological breathing disorder," for which a C-PAP machine was

prescribed.  (Tr. 17, 460, 479.)   Chapman's treating provider, Mr. Bell, indicated that he would

help Chapman obtain a C-PAP machine if she could not obtain one due to lack of insurance, but

there is no indication Chapman ever started treatment for her breathing disorder.   (Tr. 17,

479-80.)   The ALJ therefore concluded that this condition was not as limiting as Chapman

alleged.   (Tr. 17.)

The ALJ next discussed Chapman's daily activities.   He stated that she is able to perform a wide range of activities of daily living, such as watching her six-month-old and three-year-old grandchildren three days per week, using a laptop computer up to two hours at a time, reading for pleasure, cooking simple meals daily, managing her finances, and performing household chores "as needed."   (Tr. 17, 243-44.)   Chapman also reported that she does laundry, performs her personal care activities without issue, drives, shops for groceries, and spends time with others. (Tr. 243-47.)   The ALJ stated that these daily activities are inconsistent with Chapman's allegations of disabling fatigue and back pain.   (Tr. 17.)

Chapman contends that the ALJ erred in finding her subjective allegations lacked credibility due to these daily activities and that she need not be bed-ridden to be found disabled. Chapman is correct that "a claimant need not prove she is completely bedridden or completely helpless to be found disabled."   *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).   Although Eighth Circuit cases sometimes send "mixed signals" concerning the relevance of a claimant's daily activities in credibility determinations, the daily activities admitted by Chapman are in excess of other cases where the daily activities have undercut a plaintiff's credibility.   *See Clevenger v. Social Sec. Admin.*, 567 F.3d 971, 976 (8th Cir. 2009) (acknowledging that the Eighth Circuit has sent "mixed signals" concerning the importance of daily activities, but agreeing that the daily activities in that case—doing laundry, washing dishes, changing sheets, ironing, preparing meals, driving, attending church, and visiting friends and relatives—supported an ALJ's decision to discredit a plaintiff's assertions of disabling pain).   The daily activities in this case, particularly Chapman's ability to take care of her young grandchildren, exceed those in *Clevenger*.   *See also Andrews v. Colvin*, 791 F.3d 923, 929 (8th Cir. 2015) (permitting an ALJ to discount a

fibromyalgia plaintiff's credibility in part based upon the claimant's daily activities, including the ability to cook, clean, drive, shop, and take care of personal grooming and hygiene). Chapman's daily activities are another factor supporting the ALJ's decision to discount Chapman's credibility.

The ALJ next addressed the third-party function reports from Chapman's mother and daughter-in-law. (Tr. 17.) He stated that these reports were consistent with Chapman's subjective reports and were, therefore, cumulative. *Id.* The ALJ gave them "no special significance" for the same reasons he found Chapman less than credible. *Id.* Where an ALJ properly discredits a claimant's complaints of disabling symptoms, he is equally empowered to reject the cumulative testimony of the claimant's relatives and acquaintances. *Black v. Apfel,* 143 F.3d 383, 387 (8th Cir. 1998) (citing *Ostronski,* 94 F.3d at 419). Thus, the ALJ did not err in evaluating the third party statements.

As to Chapman's mental impairments, the ALJ acknowledged that Chapman has been diagnosed with depression and a panic disorder, and that she reports symptoms of daily crying spells, difficulty focusing longer than a few minutes at a time, mood swings, social isolation, and suicidal thoughts. (Tr. 18.) The ALJ found that Chapman's mental impairments cause some interference in her ability to perform work activities, but the record reveals that her symptoms are not "of such a consistent and continuous nature that they would preclude all work activity." *Id.*

In support of this finding, the ALJ first noted that, despite Chapman's report to the consultative psychologist in April 2013 of a six-year history of depression and ten-year history of panic, she was able to engage in substantial gainful activity between 2004 and 2009. (Tr. 18, 221.) The ALJ properly considered Chapman's ability to work for years with her mental impairments as evidence that detracted from her allegation of total disability. *Goff v. Barnhart,* 421 F.3d 785, 793 (8th Cir. 2005).

The ALJ noted that Chapman did not report any mental difficulties in her Function Report, completed at the same time she underwent her consultative psychological examination—April 2013.  (Tr. 18, 243-51.)   In fact, Chapman reported she had "no problem" with attention, following instructions, or getting along with authority figures.  (Tr. 249-50.)   She stated that she took Xanax for panic attacks, but "generally I can handle stressful situations ok," and had "no problems" handling changes in routine.  (Tr. 250.)   The ALJ accurately concluded that Chapman's own reports were inconsistent with the presence of disabling mental impairments.

As to the medical evidence, the ALJ pointed to the findings of the consultative examiner that Chapman exhibited good eye contact, displayed appropriate emotional responses, exhibited normal speech, engaged in the interview process, and maintained concentration to tasks and discussion.  (Tr. 18, 419-26.)   He noted that Chapman complained of increased psychosocial stressors in March 2014 and was tearful during examinations on some occasions, but her primary care provider also noted she was generally in good spirits with a pleasant affect.  (Tr. 18, 458, 463, 471, 475.)   The ALJ pointed out that Chapman's mental health treatment was conservative, consisting of prescription psychotropic medications, Xanax[2] and Celexa,[3] but she has no history of individual therapy or formal outpatient mental health treatment.  *See Pratt v. Astrue,* 372 Fed. App'x 681, 682 (8th Cir. 2010) (per curiam) (holding that ALJ's credibility finding was supported by, inter alia, lack of mental health treatment); *Spradling v. Chater,* 126 F.3d 1072, 1075 (8th Cir. 1997) (finding that claimant's failure to seek more aggressive treatment for complaints of disabling pain detracted from credibility).

The ALJ did acknowledge Chapman's inpatient treatment for an attempted overdose in

---

[2]   Xanax is indicated for the treatment of anxiety and panic disorders.  *See* WebMD, http://www.webmd.com/drugs (last visited August 28, 2017).
[3]   Celexa is indicated for the treatment of depression.  *See* WebMD, http://www.webmd.com/drugs (last visited August 28, 2017).

January 2015, but pointed out that the record reveals this was an isolated episode secondary to a sudden increase in psychosocial stressors. (Tr. 18, 483) Specifically, Chapman reported that she had just discovered her husband was having an affair. *Id.* There was no recommendation that Chapman begin intensive outpatient mental health treatment following her hospitalization. *Id.*

Finally, the ALJ found that Chapman's daily activities, as previously discussed, were inconsistent with her alleged disabling mental impairments. (Tr. 19.)

For all of the above reasons, the ALJ gave numerous, specific reasons for discounting Chapman's credibility, and that determination is entitled to deference in this Court. *Buckner*, 646 F.3d at 558.

## 2. Opinion Evidence

Chapman argues that the ALJ erred by "failing to accord 'controlling weight' or 'great weight' to the opinion of the treating physician." (Doc. 14 at 29.) The "treating physician" to which Chapman refers is "Dr. Jimmy Bell." *Id.* Chapman also contends that the ALJ failed to assign "great weight" to Dr. Charles Cunningham, D.O.; Dr. David White; Dr. Brent Caudill; and Dr. Anne De Lonais. Chapman finally argues that the ALJ erred in assigning significant weight to the consulting physicians—Drs. Demorlis and Derix.

As an initial matter, Jimmy Bell is not a physician. Rather, Mr. Bell is a registered nurse and family nurse practitioner. (Tr. 469.) As such, his opinion is not entitled to controlling weight. "[T]here are three major distinctions between acceptable medical sources and other[ sources]: (1) only acceptable medical sources can provide evidence to establish the existence of a medically determinable impairment, (2) only acceptable medical sources can provide medical opinions, and (3) only acceptable medical sources can be considered treating sources." *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (citations omitted). "Other sources" include medical

sources such as nurse practitioners, physician assistants, chiropractors, and licensed clinical social workers or therapists.   *Id.*

Further, although Mr. Bell treated Chapman for her various complaints, he did not provide an opinion regarding her limitations.   Similarly, the physicians to which Chapman refers—Drs. Cunningham, White, Caudill, and De Lonais—did not provide opinions as to limitations. Chapman's argument that the ALJ erred in weighing these opinions, therefore, lacks merit.

The ALJ properly discussed the treatment notes of Mr. Bell.   The ALJ noted that Mr. Bell prescribed Neurontin in October 2014, due to Chapman's complaints of neuropathic pain in her lower extremities, despite no evidence of positive electromyogram or nerve conduction studies. (Tr. 13, 470-72.)   Mr. Bell stated that Chapman's peripheral edema was controlled.   (Tr. 470.) In January 2015, Chapman's gait was normal and her peripheral edema was controlled.   Chapman reported swelling to Mr. Bell in February, but upon examination, she displayed no edema.   (Tr. 13, 470-72.)   The ALJ noted that Chapman's gait was usually normal after February 2014.   (Tr. 16, 454, 458, 471, 463.)      He pointed out that on her February 14, 2014 visit, Mr. Bell instructed Chapman that "she really needs to stop drinking soda, change her lifestyle and think about getting a treadmill and starting to exercise once we get her CPAP if she needs one."   (Tr. 17, 454.)   The ALJ acknowledged that Chapman complained of extreme fatigue due to obstructive sleep apnea in early 2014, but noted that Chapman had not yet started treatment for her sleep apnea.   (Tr. 17.) The ALJ concluded that Chapman received conservative treatment from Mr. Bell, which was inconsistent with her allegations of disabling pain and limitations.   (Tr. 17.)

The ALJ also discussed the medical records of Drs. Cunningham, Caudill, White, and De Lonais.   Drs. Caudill, White, and De Lonais are attending physicians at Salem Memorial District Hospital.   The hospital identified Dr. Cunningham as Chapman's primary care physician on each

of her emergency room visits, but Chapman points to no evidence from Dr. Cunningham.

On January 28, 2012, Chapman complained of a headache, sore throat, and earache. (Tr. 374) Dr. Caudill diagnosed her with an ear infection and migraine headache. (Tr. 384.) Chapman presented to the emergency room with complaints of back pain and stiffness on July 1, 2012. (Tr. 325.) Dr. Caudill found no neurological abnormalities and noted only moderate tenderness of the back. (Tr. 327.) He diagnosed Chapman with back sprain and discharged her. (Tr. 333.) Dr. Caudill was also the attending physician when Chapman presented after attempting suicide on January 9, 2015. (Tr. 486.) Dr. White examined Chapman in November 2012, when Chapman presented with complaints of a migraine that had lasted sixteen days. (Tr. 306.) Dr. White diagnosed Chapman with acute sinusitis and discharged her. (Tr. 308.) Dr. De Lonais examined Chapman on March 12, 2013, when she presented to the emergency room with complaints of increased swelling in her legs. (Tr. 295.) Upon examination, Dr. De Lonais noted leg swelling, with no other significant findings. (Tr. 297.) Dr. De Lonais discharged Chapman and instructed her to elevate her legs, lose weight, start a low salt diet, and follow-up with her primary care physician. *Id.* The ALJ properly discussed this evidence.

The ALJ also evaluated the opinions of consultative examiners Drs. Demorlis and Derix. Chapman saw Dr. Demorlis for a "disability physical" on April 18, 2013. (Tr. 442.) Chapman was cooperative and "move[d] around easily." *Id.* Chapman reported that she had torn her left rotator cuff between 2003 and 2005 in a work injury. *Id.* She never underwent surgery for this injury. *Id.* Chapman reported that she experienced no shoulder pain on good days. *Id.* Upon examination, Dr. Demorlis found that she had full strength in both arms. *Id.* Chapman complained of swelling in both legs, which began the past two to three months. *Id.* On examination, Dr. Demorlis noted "trace, if that, edema" in the right lower leg. *Id.* Chapman had

"pitting up to the knee which is + 3" in the left lower leg. *Id.* She had not undergone any vascular studies. *Id.* Dr. Demorlis stated that the edema might be caused by adhesions from a complicated total hysterectomy Chapman had undergone in the past, combined with her morbid obesity. *Id.* Chapman reported arthritis in her back and hips, and rated her pain level from such as ranging from a four to eight. *Id.* Upon examination, Chapman had full range of motion, other than genu valgi[4] of the knees. *Id.* Chapman complained of "migraines," which had been occurring one to two times a month for about ten years. (Tr. 443.) When Dr. Demorlis asked Chapman about neuropathy, she denied experiencing this symptom. *Id.* Finally, Chapman reported that she only slept one to two hours at night, which may be related to depression. *Id.* She indicated that she had been depressed for five to six years but was not suicidal. *Id.* Functionally, Chapman claimed that she could walk about fifteen minutes before her leg swelling worsened. *Id.* She reported that she could only stand for four to five minutes for the same reason, although Dr. Demorlis noted that she "stood longer than that here." *Id.* Chapman claimed no problems sitting except for occasional back pain; and reported that she could lift up to twenty-two pounds, which was the weight of her grandson. *Id.* Chapman was not taking any medications at that time, and was smoking one package of cigarettes a day. *Id.* Dr. Demorlis' neurological examination revealed no sensory loss, full grip strength, a mild limp "but it is heel toe," Chapman was able to do a half squat, and she was able to walk on her heels and toes. (Tr. 445.) Dr. Demorlis diagnosed her with the following: substantial left lower leg edema with no varicosities; morbid obesity; post difficult total hysterectomy in 2011; left rotator cuff tear-full range of motion; probable depression; headaches-possibly migraines; and an ongoing history of tobacco use. *Id.* He expressed the opinion that Chapman could occasionally lift and carry ten

---

[4]   A deformity marked by lateral angulation of the leg in relation to the thigh. *Stedman's Medical Dictionary*, 800 (28th Ed. 2006).

pounds, frequently lift or carry less than ten pounds, and was capable of sustaining a forty-hour workweek on a continuous basis at a sedentary job. (Tr. 447.)

The ALJ stated that he was assigning "significant weight" to the opinion of Dr. Demorlis because it was "consistent with the claimant's normal gait, the mild objective evidence, and the claimant's partially credible report that she can lift her 22-pound grandson." (Tr. 17.) Chapman argues that the ALJ erred in assigning significant weigh to Dr. Demorlis because he only saw her one time, whereas Mr. Bell was her treating provider.

"'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'" *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)). Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources. *See* 20 C.F.R. § 416.927(c)(1)-(2). However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record. *See Casey v. Astrue*, 503 F.3d 687, 692 (8th Cir. 2007).

If an ALJ declines to ascribe controlling weight to the treating physician's opinion, he must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. §§ 404.1527(c); 416.927(c).

The ALJ did not err in assigning weight to Dr. Demorlis' opinion. As previously discussed, Mr. Bell did not provide an opinion regarding Chapman's limitations and even if he did,

it would not be entitled to controlling weight. The ALJ, therefore, was not required to weigh opposing medical opinions.

The ALJ provided sufficient reasons for assigning significant weight to Dr. Demorlis' opinion. The opinion was supported by Dr. Demorlis' own findings on examination that Chapman moved around easily, had full strength in both arms, had full range of motion, no sensory loss, full grip strength, was able to do a half squat and walk on her heels and toes; and Chapman's reports that she had no difficulty sitting and could lift up to twenty-two pounds. As the ALJ noted, Dr. Demorlis' opinion is also consistent with the other objective medical evidence, which revealed a mostly normal gait and minimal abnormalities.

Chapman saw Dr. Derix for a psychological examination at the request of the state agency on April 19, 2013. (Tr. 419-26.) Chapman reported that she experiences a "funk" although she is normally a happy person. (Tr. 419.) She indicated that her symptoms of depression started approximately six year prior, which coincided with relationship difficulties. *Id.* Chapman also complained of anxiety and panic attacks, which had been occurring for approximately ten years. (Tr. 420.) She indicated that stressors such as arguing with her husband usually triggered her panic attacks, and that the last attack occurred three months prior. *Id.* Chapman stated that her mental health symptoms cause her to isolate, resulting in her missing out on a lot of things in life. *Id.* Chapman denied a history of mental health hospitalizations or treatment, and reported that she had not been formally diagnosed with any mental health conditions, although she had been taking Xanax for panic attacks for approximately five years on an as-needed basis. (Tr. 421.) When asked why she was unable to work, Chapman indicated that the swelling in her legs prevented her from standing. (Tr. 422.) Chapman reported that she enjoyed doing needlepoint as a hobby. She described her daily routine as follows: wakes at 6:30 a.m. to get her son ready for school,

watches her grandchildren three days a week, and spends the rest of her time watching television because pain prevents her from standing.  (Tr. 423.)   Upon mental status examination, Chapman's hygiene was fair, with no impairments in grooming; her display of emotions was appropriate; eye contact was good; speech was normal; no poverty of content was noted; she engaged throughout the process and maintained concentration to tasks and topics presented; was a decent historian; her insight and judgment were "questionable based on her history;" she was alert and oriented; no psychotic symptoms were displayed; her flow of thought was coherent; her intellectual ability was estimated as average; she had no language deficits; her memory was intact; and she demonstrated the ability to complete simple math tasks.  (Tr. 423-24.)   Dr. Derix diagnosed Chapman with major depressive disorder, recurrent, moderate; and panic disorder; with a GAF score of 50-55.  (Tr. 424-25.)   She stated that Chapman's panic attacks appeared to be controlled by Xanax.  (Tr. 425.)   Dr. Derix expressed the opinion that Chapman had no difficulties with understanding and remembering simple instructions; no difficulties with concentration and persistence on simple tasks; was capable of concentrating and carrying out simple tasks, interacting in situations with peers; interacting with supervisors; and adapting to a simple environment.  (Tr. 425-26.)   She was likely to require accommodations for physical pain and stamina.  (Tr. 426.)

The ALJ indicated that he was assigning significant weight to Dr. Derix's opinion because Dr. Derix "examined the claimant in person and her opinion is consistent with the claimant's activities of daily living, including her ability to socialize with family, shop, perform household chores, and read for pleasure."  (Tr. 20.)   The ALJ further stated that the GAF score assigned by Dr. Derix was consistent with the clinical signs and findings, "including occasional tearfulness during periods of increased psychosocial stressors."   *Id.*

Chapman argues that the ALJ erred in assigning significant weight to Dr. Derix's opinion because Mr. Bell's opinions were entitled to more weight. Chapman notes that the ALJ ignored Mr. Bell's records referencing increased anxiety, crying, and nightmares due to Chapman's father's death. (Tr. 456-58.) Despite Chapman's argument to the contrary, Mr. Bell's records are not inconsistent with Dr. Derix's findings and opinions. Dr. Derix acknowledged in her report that stressors usually triggered Chapman's panic attacks and increased her mental health symptoms. (Tr. 419-20.) As the ALJ noted, Mr. Bell also found that Chapman was generally in good spirits with a pleasant affect. (Tr. 18, 458, 463, 471, 475.) Thus, the ALJ did not err in weighing Dr. Derix's opinions.

Although Chapman does not directly challenge this finding, the ALJ also assigned "some" weight to the opinion of the state agency psychologist, Kenneth Burstin, Ph.D. (Tr. 20.) Dr. Burstin found, based on a review of the record, that Chapman was capable of sustaining at least moderately complex, if not complex, tasks. (Tr. 71.) The ALJ stated that a limitation to simple tasks was more consistent with Dr. Burstin's opinion that Chapman had moderate limitations in her concentration, persistence, and pace. (Tr. 20.)

Thus, the undersigned finds that the ALJ properly evaluated the medical opinion evidence.

**3.  RFC**

Chapman argues that the ALJ erred in determining her RFC because she is "unable to engage in any substantial gainful activity due to her physical and mental impairments and due to the combination of these impairments." (Doc. 14 at 14.) In support of this argument, Chapman cites all of her subjective complaints. Chapman further argues that the ALJ and Commissioner should have obtained additional evidence rather than "improperly interjecting their own medical opinion" regarding her limitations. *Id.* at 41.

The undersigned has found that the ALJ did not err in finding Chapman's subjective allegations less than credible.   As such, Chapman's claim that the ALJ's RFC was erroneous because it did not incorporate all of her subjective allegations of pain and limitation lacks merit. *See Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010) ("[The plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible."); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) ("The ALJ must first evaluate the claimant's credibility before determining a claimant's RFC."); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002) (same).

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.   *Dunahoo,* 241 F.3d at 1039.   Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.   *See Lauer v. Apfel,* 245 F .3d 700, 704 (8th Cir. 2001); *Singh v. Apfel,* 222 F.3d 448, 451 (8th Cir. 2000).   Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.   *See Lauer,* 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); *Casey v. Astrue,* 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record).   An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.   *See Cox v. Barnhart,* 471 F.3d 902, 907 (8th Cir. 2006).

The ALJ made the following determination regarding Chapman's RFC:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a restricted range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) in that she can lift 10 pounds occasionally and less than 10 pounds frequently.   She can carry 10 pounds occasionally.   She can sit for up to 6 hours in an 8-hour workday and stand or walk for

> 2 hours in an 8-hour workday. She can occasionally climb ramps
> or stairs, but never ladders, ropes, or scaffolds. She can
> occasionally stoop. The claimant should avoid more than
> occasional exposure to unprotected heights or moving mechanical
> parts. She is limited to understanding, remembering and carrying
> out simple, routine, repetitive tasks, involving simple work-related
> decisions with few, if any, changes.

(Tr. 15.)

The Court finds that the RFC formulated by the ALJ is supported by substantial evidence in the record as a whole. The ALJ explained that the physical RFC was supported by "the mild objective evidence, the claimant's obesity, and the clinical signs and findings, including occasional scapular tenderness, a normal gait, full strength, and no difficulty heel and toe walking." (Tr. 18.) He further cited Chapman's activities of daily living, including her ability to perform household chores as needed, care for her two young grandchildren, and cook daily. *Id.* The ALJ's finding that Chapman can perform a restricted range of sedentary work is consistent with Dr. Demorlis' opinion that Chapman could perform sedentary work. In addition, the weight limitation found by the ALJ is more restrictive than Chapman's own testimony that she was capable of lifting up to twenty-two pounds.

As to Chapman's mental RFC, the ALJ explained that his determination was supported by the "clinical signs and findings, including occasional tearfulness, good eye contact, and the ability to remember three out of three words after five minutes." (Tr. 20.) Additionally, Chapman's "activities of daily living, including her ability to read for pleasure, cook simple meals, socialize with family, and perform household chores, also support the above residual functional capacity assessment." *Id.* The ALJ's findings are consistent with the examination findings and opinions of Dr. Derix, and are more restrictive than the opinions of the state agency psychologist. In addition, the ALJ's determination is supported by Chapman's own reports that she had no

problems paying attention, finishing tasks, handling changes in routine, handling stressful situations, or getting along with authority figures. (Tr. 249-50.)

In addition, contrary to Chapman's allegation, the ALJ specifically considered Chapman's obesity when determining her RFC. The ALJ found that Chapman's obesity was a severe impairment, noting that she was 190 pounds and five-feet, two-inches tall, at the hearing. (Tr. 12.) The ALJ cited the language of SSR 02-01p that the "combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separate." (Tr. 12-13.) He then stated that he had considered these effects when determining Chapman's RFC. (Tr. 13.) Later in his opinion, when setting out the rationale for his physical RFC determination, the ALJ cited Chapman's obesity. (Tr. 18.)

The ALJ properly considered Chapman's obesity when determining her RFC. *See Heino v. Astrue,* 578 F.3d 873, 881 (8th Cir. 2009) ("[W]hen an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal.") The ALJ limited Chapman to a limited range of sedentary work, which involves lifting no more than ten pounds. The ALJ further limited Chapman to only occasional climbing of ramps and stairs, and stooping; no climbing of ladders, ropes, or scaffolds; and no more than occasional exposure to unprotected heights or moving mechanical parts. (Tr. 15.) This RFC adequately takes into account the effect of Chapman's obesity.

Although Chapman claims that the ALJ did not consider all of her impairments and their combined effect, the record reveals that the ALJ did properly address all of her impairments but found that they were not as limiting as Chapman alleged. The ALJ specifically discussed Chapman's neuropathic pain in her legs, migraine headaches, left rotator cuff impairment, and edema but found that the record revealed they were not severe at step two of the sequential

evaluation.   (Tr. 13.)

Chapman accurately notes that the effect of non-severe impairments must be considered when assessing a claimant's RFC.   A complete review of the record and decision of the ALJ confirm that Chapman has not established an error in the ALJ's analysis that requires remand on this point.   *See Goff*, 421 F.3d at 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").   "As long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because we would have decided the case differently."   *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).

Substantial evidence supports the ALJ's decision that, although Chapman has limitations resulting from her physical and mental impairments, she simply did not meet her burden to prove a disabling RFC.   *See Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) ("'[T]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five [of the sequential evaluation process].'") (quoting *Goff*, 421 F.3d at 790).   In limiting Chapman to a restricted range of sedentary work, the ALJ adequately accounted for the supportable degree of limitation due to Chapman's severe and non-severe medical impairments.

Finally, Chapman's claim that the ALJ should have obtained additional medical evidence lacks merit.   The Court has found that substantial evidence, including the reports of two consultative examinations, supports the ALJ's RFC determination.   Thus, the ALJ was not required to obtain additional medical opinions.   *See Tellez v. Barnhart,* 403 F.3d 953, 956-57 (8th Cir. 2005) (holding that the ALJ was not required to obtain additional medical opinions where

"there [was] no indication that the ALJ felt unable to make the assessment he did and his conclusion [was] supported by substantial evidence").

### 4. Step Five Determination

Chapman alleges that the ALJ's step five determination is erroneous for the following reasons:   the ALJ posed an inadequate hypothetical question to the vocational expert by failing to account for her non-exertional impairments, and improperly relied upon the responses of the vocational expert to the incomplete hypothetical question; the Commissioner failed to sustain her burden of establishing that there is other work in the national economy that Chapman can perform; and the Commissioner based the denial of her claim upon opportunities for work that are merely conceivable but are not reasonably possible.

When a claimant cannot perform the full range of work in a particular category of work (medium, light, and sedentary) listed in the regulations, the ALJ must produce testimony by a VE (or other similar evidence) to meet the step five burden.   *Baker v. Barnhart*, 457 F.3d 882, 894 (8th Cir. 2006).   Additionally, there is a general rule that, "[i]f a claimant has a nonexertional impairment, the Guidelines and grid are not controlling and cannot be used to direct a conclusion of disabled or not disabled without regard to other evidence such as vocational testimony." *McCoy v. Schweiker,* 683 F.2d 1138, 1148 (8th Cir. 1982) (abrogated on other grounds).

In this case, the ALJ acknowledged that Chapman's "ability to perform all or substantially all of the requirements of [sedentary] work has been impeded by additional limitations," thereby requiring the testimony of a vocational expert.   (Tr. 21.)   The ALJ properly relied on the testimony of a vocational expert to find that Chapman could perform other sedentary and unskilled positions existing in significant numbers in the national economy, such as final assembler (229,240 jobs), document preparer (97,252 jobs), and table worker (410,750 jobs).   (Tr. 21-22.)

Chapman argues that the hypothetical question posed to the ALJ was erroneous because it did not include all of her allegations of pain and limitations.   As previously discussed, the ALJ found that Chapman's subjective allegations were not entirely credible.   The hypothetical question the ALJ posed to the vocational expert (Tr. 57) was based on the RFC formulated by the ALJ, which accounted for all of Chapman's credible limitations.   Consequently, the hypothetical question posed to the ALJ was proper.   *See Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011) ("Based on our previous conclusion ... that 'the ALJ's findings of [the claimant's] RFC are supported by substantial evidence,' we hold that '[t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.'") (quoting *Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006)).

Finally, citing *Barker v. Harris*, 650 F.2d 138 (8th Cir. 1981) (per curiam), Chapman argues that the ALJ erred by finding she could work as a final assembler, document preparer, and table worker because such work was "merely conceivable" and "not reasonably possible" given her limitations.   In *Barker*, the Eighth Circuit Court of Appeals held that the district court correctly summarized the standard of review of an ALJ's decision to deny benefits, including a requirement that "the emphasis [be] on the particular claimant's capabilities and on what is reasonably possible, not on what is conceivable…" *Id.* at 139.

To the extent that this argument implies a requirement that Plaintiff be hired if she found and applied for any of the positions cited by the ALJ, it is unavailing.   "[S]tatutory definitions and social security regulations provide that disability is to be evaluated in terms of a claimant's ability to perform jobs rather than on his or her ability to obtain them." *Kerns v. Apfel*, 160 F.3d 464, 468 (8th Cir. 1998).   As the Court in *Barker* noted, "it is not the duty or the burden of the [Commissioner] to find a specific employer and job for the claimant."   650 F.2d at 139.

Thus, the ALJ's decision finding Chapman not disabled is supported by substantial evidence. *See Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008) (holding that a vocational expert's testimony is substantial evidence when it is based on an accurately phrased hypothetical capturing the concrete consequences of a claimant's limitations).

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

**/s/** Abbie Crites-Leoni
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of September, 2017.